UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| BRENT JARVIS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:14-cv-00651-TWP-MJD |
| | ) |
| CAROLYN W. COLVIN, Commissioner of the Social Security Administration, | ) ) |
| | ) |
| Defendant. | ) |

## ENTRY ON JUDICIAL REVIEW

Plaintiff Brent Jarvis ("Mr. Jarvis") requests judicial review of the final decision of the Commissioner of the Social Security Administration (the "Commissioner"), denying his application for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("the Act"), and for Supplemental Security Income ("SSI") under Title XVI of the Act.[1]  For the following reasons, the Court **AFFIRMS** the decision of the Commissioner.

### I.    BACKGROUND

**A.    Procedural History**

On September 20, 2011, Mr. Jarvis filed applications for DIB and SSI, alleging a disability onset date of September 2, 2011, due to back pain, depression, diabetes, and a learning disorder. His claims initially were denied on February 7, 2012, and again on reconsideration on February 28, 2012.  Mr. Jarvis filed a written request for a hearing on March 14, 2012.  On June 24, 2013, a hearing was held via video conference before Administrative Law Judge Frederick C. Michaud

---

[1] In general, the legal standards applied are the same regardless of whether a claimant seeks Disability Insurance Benefits or Supplemental Security Income.  However, separate, parallel statutes and regulations exist for DIB and SSI claims. Therefore, citations in this opinion should be considered to refer to the appropriate parallel provision as context dictates. The same applies to citations of statutes or regulations found in quoted decisions.

(the "ALJ"). The ALJ advised Mr. Jarvis concerning counsel and asked if he would like more time to secure an attorney. Mr. Jarvis declined the offer and elected to participate in the hearing without an attorney. Mr. Jarvis and his mother testified at the hearing, as did a medical expert and vocational expert (the "VE"). On July 10, 2013, the ALJ denied Mr. Jarvis's applications for DIB and SSI. On February 18, 2014, the Appeals Council denied Mr. Jarvis's request for review of the ALJ's decision, thereby making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. On April 25, 2014, Mr. Jarvis filed this action for judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g).

**B.     Factual Background**

At the time of his alleged disability onset date, Mr. Jarvis was 31 years old, and he was 33 years old at the time of the ALJ's decision. Mr. Jarvis attained an education through the ninth grade at which point he dropped out of high school. Prior to the alleged onset of his disability, Mr. Jarvis had a diverse history of both skilled and unskilled employment. He has worked as a horse trainer, carpenter, tree cutter and laborer, and a house mover. Mr. Jarvis asserts that he left his last employment in 2011 due to its physical nature and his back pain and depression (Filing No. 13-2 at 41).

Mr. Jarvis has been trying to obtain disability benefits for at least nine years (Filing No. 13-7 at 46). Prior to the applications in this action, he filed another application for benefits in 2010, alleging a disability onset date in 2009. A hearing was held before an administrative law judge on July 26, 2011. At that hearing, it was determined that, despite Mr. Jarvis's claim of being disabled, he was engaged in substantial gainful activity. Mr. Jarvis made over $15,000.00 in 2009 and over $20,000.00 in 2010. Mr. Jarvis did not make it past the first step in the disability determination (Filing No. 13-2 at 30).

Following his unsuccessful 2010 application, Mr. Jarvis filed his 2011 DIB and SSI applications that are now before this Court on judicial review. Mr. Jarvis contends that he suffers from back pain, depression, diabetes, and a mild learning disorder. He is prescribed medication to manage his diabetes and depression. He also has seen a therapist to help him with his depression and aversion to other people (Filing No. 13-2 at 42).

Mr. Jarvis states he began experiencing back pain in 1999, stemming from a car accident (Filing No. 13-7 at 41). Initially, he was able to work and cope with the pain. However, Mr. Jarvis contends that in 2011 the pain became severe and debilitating. This pain led to an inability to hold a steady job or work at all.

On March 8, 2011, Mr. Jarvis met with his primary care physician to complete disability paperwork. Mr. Jarvis complained of hot flashes from his prescriptions, as well as pain in his right shoulder, wrist, and knee. He also complained of back pain and anxiety. Aside from a limited range of motion in his back and shoulder and some rattling respiratory sounds in his lungs, Mr. Jarvis's physical examination showed no remarkable issues (Filing No. 13-7 at 7).

Mr. Jarvis continued to be seen by medical providers throughout 2011 for bronchitis and other minor ailments. On September 20, 2011, he was seen in an emergency room for complaints of knee pain, resulting from jumping off a riding lawn mower two days earlier (Filing No. 13-7 at 15). The emergency room nurse noted that Mr. Jarvis was able to ambulate normally despite the knee pain. *Id.*

Mr. Jarvis's November 11, 2011 complete blood count and comprehensive metabolic panel were normal and showed no evidence of diabetes, liver or kidney dysfunction (Filing No. 13-7 at 71–72).

On December 14, 2011, Mr. Jarvis began receiving mental health treatment at Crestview Clinic for depression and anxiety. He complained of back pain that prevented him from working, which led to anxiety and depression. Mr. Jarvis stated that he was worried most of the time, was restless, and became tired easily. The counselor observed that Mr. Jarvis was alert and cooperative, and his appearance was appropriate. His speech and thought processes were normal. Mr. Jarvis complained that he was nervous, but the counselor noted that he appeared calm. He was assigned a Global Assessment of Functioning ("GAF") score of 60, with problems with his primary support group, economics, and occupation (Filing No. 13-7 at 24–27).

Two weeks later, on December 27, 2011, Mr. Jarvis met with his counselor and discussed challenges with being assertive, which led to him being taken advantage of. He reported feelings of worthlessness and anger. He reported that he would take a three-mile walk when he was angry to calm down. The counselor observed that Mr. Jarvis appeared to be in no pain or discomfort associated with his back during the appointment. It was noted that Mr. Jarvis's mental status had not changed since the prior counseling session; his mental status was normal, logical, and appropriate. Mr. Jarvis reported to the counselor that he was at Crestview Clinic to complete paperwork for disability benefits. Based on observations and Mr. Jarvis's comments, the counselor opined that Mr. Jarvis could have been presenting symptoms of malingering in an attempt to obtain disability benefits (Filing No. 13-7 at 21–22).

During his counseling session on January 10, 2012, it was observed that Mr. Jarvis had improved with being assertive while remaining respectful. Mr. Jarvis reported that his mood and feelings were stable. His GAF score improved to 62, and continued problems with his primary support group, economics, and occupation were noted (Filing No. 13-7 at 19–20).

On January 16, 2012, Mr. Jarvis met with David Orme, M.D., ("Dr. Orme") for a consultative internal medicine examination. Mr. Jarvis complained of back pain and depression. The physical examination resulted in normal findings. Dr. Orme noted that Mr. Jarvis had normal posture and gait, no inflammation in his joints, and full range of motion in all extremities and the spine (Filing No. 13-7 at 41–44).

On February 2, 2012, Mr. Jarvis met with Glenn S. Davidson, PhD, ("Dr. Davidson") for a consultative psychological examination. Mr. Jarvis reported that he was experiencing anxiety and depression with occasional anger outbursts. He also stated that he had been trying to receive disability benefits for approximately nine years (Filing No. 13-7 at 46–48). Mr. Jarvis reported to Dr. Davidson that he had a mild learning disorder and that he could not spell. The psychological examination resulted in normal findings. Dr. Davidson assigned Mr. Jarvis a GAF score of 70, noting questionable reliability because of Mr. Jarvis's motivation to obtain disability benefits (Filing No. 13-7 at 48).

At the hearing before the ALJ on June 24, 2013, Mr. Jarvis testified that he could read, write and do math. He testified that he had not worked for pay since June 2011 because of his back pain and depression. Mr. Jarvis testified he is reluctant to leave his house without his wife or mother because of his depression and aversion to large crowds of people (Filing No. 13-2 at 41). He testified that on a good day he can walk about a half a block before it becomes painful, he can stoop and bend at the waist but it is painful, he can lift twenty-five to thirty pounds, and he can sit for twenty to twenty-five minutes before changing positions (Filing No. 13-2 at 42).

As part of his daily activities, Mr. Jarvis helps provide daily care for his young son and daughter. He also does household chores such as cooking meals, cleaning, and doing laundry. Mr. Jarvis drives, shops for groceries and clothing, and does home repairs and yard work.

5

## II. DISABILITY AND STANDARD OF REVIEW

Under the Act, a claimant may be entitled to DIB or SSI only after he establishes that he is disabled. Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In order to be found disabled, a claimant must demonstrate that his physical or mental limitations prevent him from doing not only his previous work but any other kind of gainful employment which exists in the national economy, considering his age, education, and work experience. 42 U.S.C. § 423(d)(2)(A).

The Commissioner employs a five-step sequential analysis to determine whether a claimant is disabled. At step one, if the claimant is engaged in substantial gainful activity, he is not disabled despite his medical condition and other factors. 20 C.F.R. § 416.920(a)(4)(i). At step two, if the claimant does not have a "severe" impairment that meets the durational requirement, he is not disabled. 20 C.F.R. § 416.920(a)(4)(ii). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). At step three, the Commissioner determines whether the claimant's impairment or combination of impairments meets or medically equals any impairment that appears in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, and whether the impairment meets the twelve month duration requirement; if so, the claimant is deemed disabled. 20 C.F.R. § 416.920(a)(4)(iii).

If the claimant's impairments do not meet or medically equal one of the impairments on the Listing of Impairments, then his residual functional capacity will be assessed and used for the fourth and fifth steps. Residual functional capacity ("RFC") is the "maximum that a claimant can still do despite his mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675–76 (7th

Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(1); SSR 96-8p). At step four, if the claimant is able to perform his past relevant work, he is not disabled. 20 C.F.R. § 416.920(a)(4)(iv). At the fifth and final step, it must be determined whether the claimant can perform any other work in the relevant economy, given his RFC and considering his age, education, and past work experience. 20 C.F.R. § 404.1520(a)(4)(v). The claimant is not disabled if he can perform any other work in the relevant economy.

The combined effect of all the impairments of the claimant shall be considered throughout the disability determination process. 42 U.S.C. § 423(d)(2)(B). The burden of proof is on the claimant for the first four steps; it then shifts to the Commissioner for the fifth step. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

Section 405(g) of the Act gives the court "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). In reviewing the ALJ's decision, this Court must uphold the ALJ's findings of fact if the findings are supported by substantial evidence and no error of law occurred. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* Further, this Court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008). While the Court reviews the ALJ's decision deferentially, the Court cannot uphold an ALJ's decision if the decision "fails to mention highly pertinent evidence, . . . or that because of contradictions or missing premises fails to build a logical bridge between the facts of the case and the outcome." *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010) (citations omitted).

The ALJ "need not evaluate in writing every piece of testimony and evidence submitted."

*Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). However, the "ALJ's decision must be based upon consideration of all the relevant evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ is required to articulate only a minimal, but legitimate, justification for his acceptance or rejection of specific evidence of disability. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004).

### III. THE ALJ'S DECISION

The ALJ first determined that Mr. Jarvis met the insured status requirement of the Act through June 30, 2015. The ALJ then began the five-step disability analysis. At step one, the ALJ found that Mr. Jarvis has not engaged in substantial gainful activity since September 2, 2011, the alleged onset date of disability. At step two, the ALJ found that Mr. Jarvis has the following severe impairments: diabetes, arthralgia, and depression. At step three, the ALJ concluded that Mr. Jarvis does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

The ALJ then determined that Mr. Jarvis has an RFC "to lift and carry 10 pounds frequently and 20 pounds occasionally; he can stand and walk up to 6 hours out of an 8-hour day and he can sit up to 6 hours out of an 8-hour day; he is limited to only occasional public contact." (Filing No. 13-2 at 15.) The ALJ found that the veracity of Mr. Jarvis's complaints of disabling pain and limitations was reduced because of the evidence that he had been pursing disability for many years and still continued to work at a substantial gainful level during that time (Filing No. 13-2 at 19). Further, medical opinion suggested malingering to attain disability benefits, as Mr. Jarvis made several conflicting claims to health care providers and the ALJ. *Id.*

At step four, the ALJ determined that Mr. Jarvis is unable to perform his past relevant work as a horse trainer, carpenter, tree cutter/laborer, and a house mover because the demands of his

8

past relevant work exceed his RFC. At step five, the ALJ determined that Mr. Jarvis is not disabled because there are jobs that exist in significant numbers in the national economy that Mr. Jarvis could perform, considering his age, education, past work experience, and RFC. The ALJ denied Mr. Jarvis's applications for DIB and SSI because he is not disabled.

## IV.   DISCUSSION

In his request for judicial review, Mr. Jarvis argues that the ALJ's decision is not supported by substantial evidence, and there were errors of law requiring reversal. However, Mr. Jarvis does not explain any errors of law that occurred. Instead, he asserts that the ALJ failed to look at all his medical records and consider his medical history dating back to childhood. He also disagrees with the ALJ's determination that there are jobs in the national economy that Mr. Jarvis can perform.

**A.   Substantial evidence supports the ALJ's decision at each step of the disability determination, including that Mr. Jarvis's impairments do not meet or medically equal a listed impairment.**

Mr. Jarvis asserts that the ALJ's decision must be reversed because there is not substantial evidence to support the determination that his severe impairments do not meet or medically equal a listed impairment. He contends that he is disabled because of lung disease, bone deficiency in his legs, a digestive disorder, and diabetes (Filing No. 15 at 1).

However, Mr. Jarvis's argument overlooks the pages of analysis that the ALJ completed when reviewing the medical records in this case. The ALJ reviewed and considered the submitted medical records throughout his decision. He also considered Mr. Jarvis's treatment notes, doctors' opinions, statements from Mr. Jarvis and his mother, and evidence of Mr. Jarvis's daily activities provided by him and his family. At the hearing, the ALJ questioned Mr. Jarvis about his medical conditions and limitations and then asked him whether they had covered everything and whether

9

there were any other things that Mr. Jarvis would like to discuss. Mr. Jarvis testified that they covered everything.

While considering the medical records, the ALJ emphasized that nowhere in the record did any physician give the opinion that Mr. Jarvis's conditions met or medically equaled any listed impairment. The medical opinions and findings supported the ALJ's decision. The state agency reviewing medical experts and the impartial testifying medical expert, Anthony E. Francis, M.D. ("Dr. Francis"), opined that Mr. Jarvis's impairments did not meet or medically equal any listed impairment. Dr. Francis also testified that Mr. Jarvis remained capable of performing a limited range of light work.

Additionally, the ALJ considered consistent evidence of Mr. Jarvis's ability to perform activities of daily living. In a mental status examination performed by Dr. Davidson, Mr. Jarvis stated that he had no problem cooking, driving, paying bills, or shopping. He bathes regularly, helps his daughter with her homework and drives his children to and from school. Dr. Davidson noted that Mr. Jarvis may have a mild learning disorder and anxiety disorder. Dr. Davidson's findings were corroborated by the testimony of Mr. Jarvis at the administrative hearing. However, the ALJ noted that any learning and comprehension difficulties were consistent with Mr. Jarvis's ninth-grade level education.

Further, the ALJ considered indications of malingering by Mr. Jarvis. While being seen for mental health treatment at Crestview Clinic, Mr. Jarvis stated that he suffered from intense back pain; however, counselors witnessed him leaning back in the chair and rocking back and forth with seemingly no pain. He also told a Crestview counselor that he walks three miles when he is angry to calm down; however, he testified at the hearing that he could barely walk a half block without pain. Dr. Davidson also reported that he questioned Mr. Jarvis's credibility because Mr.

Jarvis told him that he had been attempting to receive disability benefits for many years. The ALJ also looked at Mr. Jarvis's previous application for disability benefits. In that instance, Mr. Jarvis claimed to be disabled, but he was engaged in substantial gainful employment and earned approximately $20,000.00, making him not disabled.

Mr. Jarvis also argues the ALJ's decision was in error because the agency and its doctors have not reviewed all of his medical records dating back to childhood or heard what his treating physicians told him face-to-face. Mr. Jarvis states that many of these medical records are unavailable because the records date back to his childhood or because his past physicians have retired or died. The Court rejects this argument. As an initial matter, the ALJ is required to consider Mr. Jarvis's potential disability only from the date of his alleged onset of disability, September 2, 2011, to the date of the ALJ's decision, not the entirety of his life. Further, the ALJ is capable of considering only the evidence that has been presented. The ALJ bases his findings on the evidence in the record, and there is no evidence that the record was incomplete. In fact, when the ALJ asked Mr. Jarvis whether there were any other things that Mr. Jarvis would like to discuss or cover at the hearing, Mr. Jarvis testified that they had covered everything. When Mr. Jarvis was given the opportunity to question the medical expert and VE at the hearing, he declined to do so.

The ALJ considered all of the record evidence when determining whether Mr. Jarvis's impairments met or medically equaled a listed impairment. The ALJ properly considered all opinions, giving those that were consistent with and supported by the record as a whole greater weight. Mr. Jarvis is asking this Court to reweigh the evidence, but it is not the responsibility of the Court to reweigh the evidence but rather to ensure that the ALJ followed the proper standards in reaching his findings and that the findings were supported by substantial evidence. The ALJ

correctly executed his responsibility of making the final disability determination, and substantial evidence supports his decision.

**B.     The ALJ's determination that Mr. Jarvis is not disabled because there are a significant number of jobs in the economy that he is able to perform is supported by substantial evidence.**

Mr. Jarvis's other argument concerns the ALJ's step-five determination that, despite not being able to perform his past work, Mr. Jarvis is not disabled because he can perform jobs that exist in significant numbers in the national economy.  Mr. Jarvis argues that he is unable to perform any substantial gainful activity, and the ALJ's decision is not supported by substantial evidence to find that there are a significant number of jobs in the national economy that he is able to perform (Filing No. 15 at 1).

This argument is unavailing because of the substantial evidence in the record that the ALJ used to support his RFC finding and subsequent determination that Mr. Jarvis could perform some work.  In determining Mr. Jarvis's RFC, the ALJ considered the record as a whole, looking at the medical records and opinions, Mr. Jarvis's testimony, his mother's testimony, and his activities of daily living.  The ALJ took into account all alleged symptoms, subjective testimony, and objective medical evidence.

When considering opinion evidence, the ALJ considered the statements from treating and examining physicians, as well as the opinions of consultative physicians and mental health providers and the testifying medical expert.  The ALJ gave very little weight to the opinions of Mr. Jarvis's 2011 primary care physician, Derrick A. Williams, M.D. ("Dr. Williams"), because the opinions regarding functional capacity lacked any significant objective basis with no medical support.  It was prepared on a fill-in-the-blank form with Mr. Jarvis's application for disability

benefits in mind (Filing No. 13-2 at 20). No evidence in the medical record supported the opinion of Dr. Williams, and thus, it was proper for the ALJ to assign it little to no weight in his decision.

Additionally, the ALJ considered the statements of Mr. Jarvis and his mother, Celia Jarvis. Mr. Jarvis's mother's statements were not inconsistent with the RFC findings of the ALJ. She stated that Mr. Jarvis is capable of cooking, cleaning, home repairs, and yard work (Filing No. 13-6 at 6–13). She also stated that he had little problem driving, caring for himself, and caring for his young children. *Id.* Moreover, Mr. Jarvis's mother's statement was corroborated by Mr. Jarvis himself (Filing No. 13-6 at 14–21).

The ALJ found Mr. Jarvis's testimony to be internally inconsistent as well as inconsistent with the objective medical evidence. While his impairments could be expected to cause his symptoms, the intensity, persistence, and limiting effects of the symptoms were not credible or supported. As noted above, the ALJ pointed to several instances in the record that conflicted with Mr. Jarvis's testimony. He also looked to several opinions of medical professionals who seriously doubted Mr. Jarvis's credibility and thought he was malingering (Filing No. 13-2 at 19).

The ALJ gave significant weight to the testimony of the VE when he determined that there is a significant number of jobs in the national economy that Mr. Jarvis can perform with an RFC of a limited range of light work. Based on the opinion of the VE, there were over 229,000 jobs as an assembler in the national economy that could be performed by an individual who has Mr. Jarvis's RFC (Filing No. 13-2 at 46). As required for the step-five determination, the ALJ also considered Mr. Jarvis's age, education, work experience, and RFC. Substantial record evidence supported the ALJ's determination. Having determined that Mr. Jarvis has an RFC to perform work that exists in significant number in the national economy, the ALJ concluded that Mr. Jarvis is not disabled.

## V. CONCLUSION

For the reasons set forth above, the final decision of the Commissioner is **AFFIRMED**. Mr. Jarvis's appeal is **DISMISSED**.

**SO ORDERED.**

Date: 8/5/2015

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Brent Jarvis
420 West Fifth Street
Anderson, Indiana  46016

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov